# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 6, 2026

Lyle W. Cayce
Clerk

No. 25-20131

———————————

Balvina Renteria,

*Plaintiff—Appellant*,

*versus*

Grieg Star AS; Grieg Maritime Group AS; Grieg Foundation,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-2025

———————————————————

Before Jones and Engelhardt, *Circuit Judges*, and Summerhays, *District Judge*.*

Robert R. Summerhays, *District Judge*:

Plaintiff Balvina Renteria ("Renteria"), an injured maritime worker, appeals from the district court's grant of summary judgment to defendant Grieg Star AS ("Grieg Star") on her claim of vessel negligence. We AFFIRM.

———————————————

* United States District Judge for the Western District of Louisiana, sitting by designation.

No. 25-20131

## I.

On her third day of unloading cargo from the *M/V Star Juventas*, longshore worker Balvina Renteria, an employee of Cooper/Ports America, stepped on plastic sheeting covering a gap between stacked cargo and fell ten feet to the steel deck of the cargo hold. Grieg Star was the vessel's "technical manager."[1] The cargo consisted of ten-foot-tall rolls of kraft liner board, which had been loaded onto the vessel by longshoremen in Italy. The rolls were stacked in the cargo hold, with airbags in some of the gaps between rolls. Black plastic netting or sheeting with holes was placed around the edges of the hold between each layer of cargo, thereby covering the outer portion of each layer of cargo. At the time of the accident, the longshore crew was removing the last layer of cargo in Hold 6, and Renteria's assignment was to roll up the plastic sheeting. Renteria stepped on the plastic sheeting covering a gap between rolls and fell ten feet.

---

[1] Section 902 of the Longshore and Harbor Workers' Compensation Act ("LHWCA") defines the term "vessel" to include the "vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). Grieg Star conceded in district court that a vessel's technical manager is encompassed in the definition of "vessel" set forth in the Act.

No. 25-20131



Photograph of Hold 6

Renteria received her instructions from the stevedore and never communicated with the vessel's crew. The vessel's crew did not instruct or direct the longshoremen regarding cargo operations. Each day before beginning cargo operations, the vessel's master or chief officer met with the stevedore supervisor for a morning safety meeting, the stevedore inspected the cargo hold, and the longshoremen attended a safety meeting with the stevedore foreman and safety man. At these meetings, Renteria was instructed to watch where she stepped but was never specifically instructed not to walk on the black plastic sheeting.

No. 25-20131

Renteria filed suit against Grieg Star in Texas state court in May 2023, alleging vessel negligence under the LHWCA, 33 U.S.C. § 905(b).[2] Grieg Star removed the action to federal court the following month. After discovery, Grieg Star moved for summary judgment on all claims. The district court granted summary judgment for Grieg Star. Renteria timely appealed.

## II.

"This court reviews de novo a district court's grant of summary judgment, applying the same standard as the district court."[3] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] A genuine dispute of material fact exists "when the evidence is such that a reasonable jury could return a verdict for the non-moving

———————————

[2] This subsection reads in pertinent part as follows:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b).

[3] *Johnson v. Cooper T. Smith Stevedoring Co., Inc.*, 74 F.4th 268, 272 (5th Cir. 2023) (quoting *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017)).

[4] FED. R. CIV. P. 56(a).

party."[5] All evidence must be viewed in the light most favorable to the nonmoving party and all reasonable inferences are to be drawn in that party's favor.[6]

## III.

Section 905(b) of the LHWCA "supplies the relevant tort-based duties owed by vessel owners to longshoremen."[7] The Supreme Court in *Scindia Steam Nav. Co., Ltd. v. De Los Santos* outlined three narrow duties shipowners owe to longshoremen: (1) the turnover duty, (2) the active control duty, and (3) the duty to intervene.[8] "The basic principle which emerges from *Scindia* is that the primary responsibility for the safety of the longshoreman rests upon the stevedore."[9] Here, Renteria appeals only the district court's dismissal of her claim based on alleged violations of the turnover and active control duties.[10]

---

[5] *Johnson*, 74 F.4th at 272 (quoting *Austin*, 864 F.3d at 328).

[6] *Id.* (quoting *Austin*, 864 F.3d at 328-29).

[7] *Manson Gulf, L.L.C. v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 134 (5th Cir. 2017).

[8] *Scindia*, 451 U.S. 156, 167-78 (1981); *see also Kirksey v. Tonghai Mar.*, 535 F.3d 388, 391 (5th Cir. 2008).

[9] *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir. 1990).

[10] The district court additionally found that Renteria had failed to plead a vessel negligence claim based upon the duty to intervene and that her negligence *per se* claim failed on the merits. Renteria does not appeal those portions of the district court's ruling and judgment.

**A.**

The turnover duty "relates to the condition of the ship upon the commencement of stevedoring operations."[11] The turnover duty places two obligations on the vessel owner:

> First, the owner owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety. Second, the owner owes a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it; however, the duty to warn of hidden dangers is narrow. It does not include dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering.[12]

The turnover duty to warn "may extend to certain latent hazards in the cargo stow," because "an improper stow can cause injuries to longshoremen, and thus is among the 'hazards on the ship' to which the duty to warn attaches."[13] However, "[b]ecause the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow" as the stevedore, its duty to warn of latent defects "is a narrow one."[14] The duty attaches solely to latent hazards, which are "hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work."[15] Further,

_____

[11] *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994).

[12] *Kirksey*, 535 F.3d at 392 (citations omitted).

[13] *Howlett*, 512 U.S. at 99 (citations omitted).

[14] *Id.* at 105.

[15] *Id.*

"the duty encompasses only those hazards that 'are known to the vessel or should be known to it in the exercise of reasonable care.'"[16]

Renteria contends Grieg Star breached its turnover duty to warn of a latent hazard in the cargo stow—namely, by failing to warn the longshoremen not to step on the plastic sheeting because there was not "appropriate fall protection" beneath the stow. While Renteria admits she "was aware of the gaps between the rolls generally," she contends that the plastic sheeting concealed the irregular gaps "and posed as fall protection," thereby "rendering the danger latent and not visible to a reasonably competent stevedore." Grieg Star responds that even assuming the plastic sheeting constituted a "defect" within the cargo stow, "it was nonetheless open and obvious" to Renteria and her stevedore foremen.

Here, Grieg Star observed the initial loading of the cargo and does not contest that it knew or should have known of the alleged defect—i.e., the gaps between rolls of kraft liner board underneath the plastic sheeting.[17] Accordingly, we turn to whether the defective condition was open and obvious.

At the time of the incident, Renteria had been doing the same work for multiple days, she had been discharging kraft liner board from Hold 6 for two days, and the stevedore crew was removing the last layer of cargo from Hold 6. Renteria knew there were gaps between the cargo underneath the plastic sheeting. She testified at the time of her fall, she "was trying to step on top of the rolls [of kraft liner board]," but instead stepped on the plastic sheeting

---

[16] *Howlett*, 512 U.S. at 105 (quoting *Scindia*, 451 U.S. at 167).

[17] *See Hernandez v. M/V Ragaan*, 841 F.2d 582, 586 (5th Cir.) ("If the condition existed from the outset, the shipowner is charged with actual knowledge of the dangerous condition and has a duty to warn the stevedore and the longshoremen if the defect is hidden."), *opinion corrected on other grounds*, 848 F.2d 498 (5th Cir.1988).

without knowing whether there was a hole or a spacer beneath her. Renteria further testified that she could have looked through the holes in the plastic sheeting to see whether there was a gap in the area where she stepped but did not do so because she was working. "If the longshoreman knew of the defect, then it is considered open and obvious," and there is no breach of the turnover duty.[18] Here, Renteria knew that there were gaps underneath the plastic sheeting, and therefore the alleged defect was open and obvious. As Renteria was aware of the condition of the cargo stow, the shipowner had no obligation to warn against this obvious danger.[19] The district court did not err in concluding that Grieg Star did not breach its turnover duty.

**B.**

The active control duty applies once stevedoring operations have begun and imposes liability on the shipowner "for injury caused by hazards under the control of the ship."[20] Specifically, the shipowner may be liable for injuries if it "actively involves itself in the cargo operations and negligently injures a longshoreman," or if it fails to exercise due care to protect longshoremen "from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation."[21] "Liability based on this exception is not relieved when the hazard is open and obvious. If, however, a vessel has relinquished control

---

[18] *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1246 (5th Cir. 1997).

[19] *Howlett*, 512 U.S. at 105; *Kirksey*, 535 F.3d at 393.

[20] *Alvarado v. Briese Schiffahrts GmbH & Co. KG MS Sapphire*, 161 F.4th 289, 296 (5th Cir. 2025) (quoting *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)); *see also Howlett*, 512 U.S. at 98.

[21] *Scindia*, 451 U.S. at 167.

over an area to the stevedore, then it is the primary responsibility of the stevedore to remedy a hazard in that area."[22]

If active control is not maintained, once stevedoring operations begin "the shipowner has no general duty to monitor the stevedoring operation . . ., and it may rely on the stevedore's judgment that equipment is reasonably safe for continued use during the work."[23] To show the existence of a genuine dispute of material fact regarding the active control duty, the longshoreman must provide evidence that the shipowner exercised "active control over the actual methods and operative details of the longshoreman's work."[24] Mere presence of the vessel's crew to monitor the progress of cargo operations or ensure "some degree of orderliness" does not constitute active control.[25]

Here, Renteria contends Grieg Star breached the active control duty because vessel crewmembers attended daily safety meetings with the stevedore supervisor, oversaw cargo operations, and were instructed to intervene if they saw a longshoreman engaging in an unsafe practice. Grieg Star contends that the record "is devoid of any fact . . . that demonstrates Grieg Star exercised actual control over the actual methods and operative details of the longshoreman's work."

---

[22] *Pimental v. LTD Can. Pac. Bul*, 965 F.2d 13, 16 (5th Cir. 1992) (citation omitted).

[23] *Stass v. Am. Com. Lines, Inc.*, 720 F.2d 879, 882 (5th Cir. 1983).

[24] *Alvarado*, 161 F.4th at 296 (quoting *Pledger v. Phil Guilbeau Offshore, Inc.*, 88 F. App'x 690, 692 (5th Cir. 2004)).

[25] *Romero v. Cajun Stabilizing Boats Inc.*, 307 F. App'x 849, 851 (5th Cir. 2009) (per curiam) (citing *Fontenot v. United States*, 89 F.3d 205, 208 (5th Cir. 1996)); *see also Manson Gulf*, 878 F.3d at 135.

No. 25-20131

On this record, there is no basis for concluding that Grieg Star attempted to "actively involve" itself in the stevedoring operations. At the time of the incident, the cargo holds had been turned over to the stevedore. The foreman or "lead man" of the longshore crew provided all instructions to the longshoremen on how to discharge the cargo. Renteria herself testified that she received all instructions from her fellow longshoremen, never communicated with any member of the vessel's crew, and no member of the vessel's crew was present at the time of her accident. That a member of the vessel's crew would oversee the loading and unloading of cargo to monitor the progress of the operation, and either the captain or chief mate would attend safety meetings with the stevedore, does not indicate that the ship's crew controlled "the actual methods and operative details of the longshoreman's work."[26]

Likewise, there is no basis to conclude that Grieg Star failed to protect Renteria from any hazard encountered in areas under the active control of the vessel. As already noted, the cargo holds were turned over to the stevedore each day before cargo operations began. Renteria was injured in Hold 6, an area under the active control of the stevedore. Where a vessel "has relinquished control over an area to the stevedore, then it is the primary responsibility of the stevedore to remedy a hazard in that area."[27] In the absence of any evidence that Hold 6 was within the active control of the vessel, the district court did not err in concluding that Grieg Star breached no duty owed to Renteria.[28]

---

[26] *Alvarado*, 161 F.4th at 296 (quoting *Pledger*, 88 F. App'x at 692); *see also Romero*, 307 F. App'x. at 851 (citing *Fontenot*, 89 F.3d at 208).

[27] *Pimental*, 965 F.2d at 16 (citation omitted).

[28] As Renteria's claim of vessel negligence fails, her punitive damages claim based on gross negligence necessarily fails.

No. 25-20131

## IV.

Because Renteria did not show a genuine dispute of material fact as to her claim of vessel negligence, the district court's grant of summary judgment to Grieg Smith is AFFIRMED.